1

2

3

4

5

6

O

7

8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

9

10

11

12

13

14

15

16

| | |
|---|---|
| SANDRA LABROWN,<br><br>                Plaintiff,<br><br>         vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of the Social<br>Security Administration,<br><br>                Defendant. | ) Case No. CV 12-0281-JPR<br>)<br>)<br>) MEMORANDUM OPINION AND ORDER<br>) REVERSING COMMISSIONER AND<br>) REMANDING FOR FURTHER<br>) PROCEEDINGS<br>)<br>)<br>)<br>)<br>)<br>) |

17 **I.   PROCEEDINGS**

18        Plaintiff seeks review of the Commissioner's final decision

19  denying her application for Social Security disability insurance

20  benefits ("DIB") and Supplemental Security Income benefits

21  ("SSI").  The parties consented to the jurisdiction of the

22  undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).

23  This matter is before the Court on the parties' Joint

24  Stipulation, filed September 17, 2012, which the Court has taken

25  under submission without oral argument.  For the reasons stated

26  below, the Commissioner's decision is reversed and this matter is

27  remanded for further proceedings.

28

## II.   BACKGROUND

Plaintiff was born on August 16, 1951. (Administrative Record ("AR") 219, 222.)  She has an 11th-grade education.  (AR 255.)  Plaintiff worked for approximately 15 years as a microfilm technician.  (AR 219, 251, 266.)  She stopped working on August 30, 2003, because she was laid off.  (AR 250.)  Plaintiff filed applications for DIB and SSI on April 9, 2004; they were denied on July 28, 2006, and the Appeals Council affirmed the denials on December 18, 2006.[1]  (AR 27.)

On January 24, 2007, Plaintiff again filed SSI and DIB applications, alleging that her circumstances had changed and she had acquired a new severe impairment since the July 2006 denial of benefits; she alleged she had been unable to work since August 1, 2006, because of lower back pain; pain in both arms, her right elbow, and her left shoulder; anxiety attacks; and depression. (AR 31, 219, 222, 250.)  After Plaintiff's applications were denied, she requested a hearing before an Administrative Law Judge ("ALJ").  (AR 160.)  A hearing was held on February 20, 2008, at which Plaintiff, who was represented by counsel, appeared and testified on her own behalf.  (AR 65-89.)  In a written decision issued on June 9, 2008, the ALJ determined that Plaintiff was not disabled.  (AR 51-61.)  Plaintiff then requested review of the ALJ's decision, and on October 8, 2008, the Appeals Council vacated the hearing decision and remanded the case for further proceedings.  (AR 149-52.)  On November 12, 2009, a hearing was held before the same ALJ, at which Plaintiff,

---

[1]Plaintiff apparently did not appeal those denials to the district court.  (See AR 27.)

2

1  who was represented by counsel, appeared and testified again on
2  her own behalf.  (AR 90-133.)  Medical Expert Dr. David Peterson
3  also testified.  (AR 95-119.)  On December 1, 2009, the ALJ
4  issued a written decision again finding that Plaintiff was not
5  disabled.  (AR 23-45.)  Plaintiff requested review of the ALJ's
6  decision and submitted additional evidence to the Appeals
7  Council; on June 8, 2011, the Appeals Council denied review.  (AR
8  9-12.)  On June 22, 2011, Plaintiff's counsel requested that her
9  case be reopened because the Appeals Council had not referenced
10 an additional legal brief he had submitted.  (AR 8.)  On November
11 17, 2011, the Appeals Council incorporated the additional
12 evidence into the record but denied Plaintiff's request for
13 review.  (AR 1-7.)  This action followed.

14 **III. STANDARD OF REVIEW**

15       Pursuant to 42 U.S.C. § 405(g), a district court may review
16 the Commissioner's decision to deny benefits.  The ALJ's findings
17 and decision should be upheld if they are free from legal error
18 and are supported by substantial evidence based on the record as
19 a whole.  § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91
20 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); <u>Parra v. Astrue</u>, 481
21 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such
22 evidence as a reasonable person might accept as adequate to
23 support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter</u>
24 <u>v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than
25 a scintilla but less than a preponderance.  <u>Lingenfelter</u>, 504
26 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880,
27 882 (9th Cir. 2006)).  To determine whether substantial evidence
28 supports a finding, the reviewing court "must review the

3

1  administrative record as a whole, weighing both the evidence that

2  supports and the evidence that detracts from the Commissioner's

3  conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

4  1996).  "If the evidence can reasonably support either affirming

5  or reversing," the reviewing court "may not substitute its

6  judgment" for that of the Commissioner.  Id. at 720-21.

7  **IV.  THE EVALUATION OF DISABILITY**

8       People are "disabled" for purposes of receiving Social

9  Security benefits if they are unable to engage in any substantial

10 gainful activity owing to a physical or mental impairment that is

11 expected to result in death or which has lasted, or is expected

12 to last, for a continuous period of at least 12 months.  42

13 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

14 (9th Cir. 1992).

15      A.   The Five-Step Evaluation Process

16      The ALJ follows a five-step sequential evaluation process in

17 assessing whether a claimant is disabled.  20 C.F.R.

18 §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,

19 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first

20 step, the Commissioner must determine whether the claimant is

21 currently engaged in substantial gainful activity; if so, the

22 claimant is not disabled and the claim must be denied.

23 §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not

24 engaged in substantial gainful activity, the second step requires

25 the Commissioner to determine whether the claimant has a "severe"

26 impairment or combination of impairments significantly limiting

27 his ability to do basic work activities; if not, a finding of not

28 disabled is made and the claim must be denied.

4

§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

---

[2]RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

B. <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since August 1, 2006. (AR 31.) At step two, the ALJ concluded that Plaintiff had the "medically determinable" impairments of "right shoulder injury, osteoarthritis, history of hernia, history of hysterectomy, gastrointestinal reflux disease (GERD), hypertension, hepatitis C infection, diabetes mellitus, obesity, and mental depression." (<u>Id.</u>) He found that Plaintiff's physical impairments in combination were severe. (<u>Id.</u>) As to her depression, however, he found that it "provides only mild limitations in her activities of daily living, social functioning and ability to maintain concentration, persistence and pace" and "has not caused any episodes of decompensation of extended duration"; thus, it was "not a severe impairment." (<u>Id.</u>) At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing. (AR 36.) At step four, the ALJ found that Plaintiff retained the RFC to perform "a reduced range of medium work,"[3] with the limitations that Plaintiff

> can lift and carry up to 50 pounds occasionally and 25
> pounds frequently. She can stand and walk up to 6 hours
> in an 8 hour day, and can sit up to 6 hours in an 8 hour
> day. She is precluded from overhead reaching with the

---

[3]"Medium work" is defined as involving "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). The regulations further specify that "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work," as defined in §§ 404.1567(a)-(b) and 416.967(a)-(b). <u>Id.</u>

6

1   right arm.  She has no other limitations.

2   (Id.)  Based on the VE's testimony, the ALJ concluded that

3   Plaintiff could not perform her past relevant work as a microfilm

4   camera operator but that she had the RFC to perform the jobs of

5   hand packer, sandwich maker, and laundry worker.  (AR 39-41.)

6   The ALJ concluded that jobs existed in significant numbers in the

7   national economy that Plaintiff could perform.  (AR 40-41.)

8   Accordingly, the ALJ determined that Plaintiff was not disabled.

9   (AR 41.)

10  **V.   DISCUSSION**

11       Plaintiff alleges that the ALJ erred in (1) finding that

12  Plaintiff's mental impairment was not severe; (2) evaluating and

13  weighing the findings and opinions of Plaintiff's treating

14  physicians; (3) determining that Plaintiff's impairments did not

15  meet or equal any impairments in the Listing; and (4) refusing to

16  order additional psychological testing.  (J. Stip at 3.)  Because

17  the medical expert testified repeatedly that the evidence of

18  Plaintiff's mental impairment was ambiguous and insufficient for

19  him to render a complete diagnosis, the ALJ's decision must be

20  reversed and this matter remanded for further proceedings.

21       A.   The ALJ Erred in Failing to Further Develop the Record

22       In her fourth claim, Plaintiff contends that the ALJ erred

23  in not ordering additional psychological testing after Dr.

24  Peterson testified that there was not sufficient evidence in the

25  record to support Plaintiff's claims of a severe mental

26  disability.  (J. Stip. at 22-23, 24.)  Plaintiff is correct.

27       An ALJ has an independent duty "to fully and fairly develop

28  the record and to assure that the claimant's interests are

7

1    considered." Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir.

2    1996) (internal quotation marks and citation omitted).  This is

3    true even if the claimant is represented by counsel.  See Celaya

4    v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003).  The ALJ's duty

5    to develop the record is triggered when there is "ambiguous

6    evidence or when the record is insufficient to allow for proper

7    evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453,

8    459-60 (9th Cir. 2001).  "The ALJ may discharge this duty in

9    several ways, including: subpoenaing the claimant's physicians,

10   submitting questions to the claimant's physicians, continuing the

11   hearing, or keeping the record open after the hearing to allow

12   supplementation of the record." Tonapetyan v. Halter, 242 F.3d

13   1144, 1150 (9th Cir. 2001).

14        In Tonapetyan, the Ninth Circuit held that an ALJ's decision

15   should have been reversed because he failed to further develop

16   the record when he heavily relied on the medical examiner's

17   testimony, which was "equivocal" and expressed "concern over the

18   lack of a complete record upon which to assess [plaintiff's]

19   mental impairment." Id. at 1150-51.  The medical examiner in

20   Tonapetyan began his testimony by stating that the evidence

21   regarding plaintiff's mental impairments was "confusing" and he

22   felt "a more detailed report [should] be obtained." Id. at 1150.

23   He "found it 'difficult to say' whether the medical record was

24   complete enough to allow the ALJ to reach a conclusion in the

25   case"; he testified that the evidence showed that plaintiff was

26   "somewhat depressed" but "resisted concluding that she did or did

27   not suffer from schizophrenia, however, suggesting that he would

28   'have to see more evidence of that and a more detailed

                                    8

explanation'" from the plaintiff's treating doctor.  <u>Id.</u>  The
medical expert ultimately diagnosed the plaintiff with only mild
depression, but "[o]nly when pressed by the ALJ," and still he
"remained equivocal throughout his testimony."  <u>Id.</u>  When asked
whether a more complete report from the plaintiff's doctor would
affect his opinion, the medical expert responded that it would,
if it "clarified her symptoms."  <u>Id.</u>  In his written opinion, the
ALJ "relied heavily on [the medical expert's] testimony,"
adopting his diagnosis of mild depression as well as his
"criticisms" of the incompleteness of the plaintiff's treating
doctors' opinions.  <u>Id.</u>  The Ninth Circuit reversed, holding that
"[g]iven this reliance, the ALJ was not free to ignore [the
medical expert's] equivocations and his concern over the lack of
a complete record," nor should he have ignored "the [medical
expert's specific recommendation that a more detailed report from
[the treating doctor] be obtained."  <u>Id.</u> at 1150-51.

     This case presents a very similar set of facts.  During the
hearing, Dr. Peterson began his testimony by noting that there
was "a lack of objective medical evidence to support the
diagnoses [of severe depression]" and there was "some
equivocation within the record."  (AR 96-97.)  He noted that
there were "likely mental health issues" but the record "has
times where it appears the claimant's just fine, and other times
where the claimant can't manage funds on her own behalf, but
there isn't adequate medical evidence to support that
contention."  (AR 97.)  He then responded to the ALJ's questions
as follows:

     Q.   So, does she have a medically determinable mental

9

1    impairment or not?

2    A.   I'd have to say, at this point, there's

3         insufficient information.

4    Q.   So, the evidence doesn't show, in your opinion,

5         that she has a medically determinable mental

6         impairment?

7    A.   In moments in time, Your Honor.

8    (AR 97-98.)  Pressed further by the ALJ to render a diagnosis,

9    Dr. Peterson continued to provide equivocal testimony.  The ALJ

10   again asked if, "in your opinion, the claimant is – currently

11   does not have a medically determinable mental impairment?"  (AR

12   99.)  Dr. Peterson responded: "More appropriately, the record

13   doesn't provide sufficient objective medical evidence to support

14   the existence of . . . a severe impairment."  (Id.)  When the ALJ

15   asked if Plaintiff's treating psychiatrist Dr. Jerome Goldfein's

16   questionnaire diagnosing Plaintiff with "major depression

17   secondary to medical problems, [rule out] dysthymia" (AR 611-15)

18   was "consistent with the other medical evidence of record," Dr.

19   Peterson responded,

20        Based on the record that I reviewed, as I've

21        described it, hopefully, I've conveyed that there's

22        moments in the record that suggest a functioning that is

23        within functional limits; and . . . functioning that

24        suggests that the claimant cannot manage funds on her own

25        behalf; lacks consistency; and most importantly, we don't

26        have objective medical evidence to suggest that the

27        impairment is that severe.

28   (AR 101.)  At the close of the ALJ's questioning, Dr. Peterson

                                   10

1    again noted that the record was ambiguous.  (AR 103.)  The ALJ
2    asked whether "the medical evidence does not show that she has a
3    mental impairment that would . . . have more than a minimal
4    [e]ffect on her basic functional abilities?"  (<u>Id.</u>)  Dr. Peterson
5    responded, "That's what the mental status exam suggests," but
6    "that does not agree with the reported symptoms . . . nor with
7    some of the opinions extended by the treating source."  (<u>Id.</u>)  He
8    concluded by noting that "[w]e would need more information" to
9    assess whether Plaintiff had "moderate impairment" in social
10   functioning.  (AR 104.)

11        When examined by Plaintiff's attorney, Dr. Peterson again
12   provided equivocal testimony and noted that the record was
13   ambiguous.  He noted that he faced a "dilemma" in drawing "a
14   general conclusion about [plaintiff's] mental health" because
15   "there's objective medical evidence suggesting functioning that's
16   not as indicated in the progress notes."  (AR 107.)  After
17   recounting some of the medical evidence in the record, he then
18   responded to Plaintiff's attorney's questions as follows:

19        Q.   So, isn't it possible that on a given day, she
20             might have been doing better; and then, other days,
21             she might have been doing worse?
22        A.   Sure.
23        Q.   Okay.  Does that negate, then, a finding that she's
24             got a mental impairment?
25        A.   It reinforces my point, that **we have equivocal**
26             **data, and we need more objective medical evidence**
27             **to establish a longstanding, enduring, marked level**
28             **of impairment**.  That's what the record doesn't

                                  11

1         show.

2   Q.   Well, so, what . . . objective evidence can we get

3         that would substantiate her?

4   A.   The typical standard (INAUDIBLE) psychological

5         testing.

6   Q.   So, you believe that, absent psychological testing,

7         we don't have enough evidence to show that she's

8         got a severe mental impairment?

9   A.   No.   If this record had progress notes from a

10        psychiatrist indicating marked level of impairment,

11        mental status exams from a consultative exam

12        indicating marked level of impairment, an adult

13        initial assessment from the treating source

14        indicating marked level of impairment, then we

15        would have agreement, and there's not a problem.

16        We don't have that in this record.

17  (AR 109-10 (emphasis added).)   When Plaintiff's attorney asked,

18  "So . . . there's equivocal information, but you're saying it's

19  likely she has a mental health impairment," Dr. Peterson

20  responded, "No, I, I can't say that, because there isn't enough

21  information."   (AR 113.)   He further testified:

22  A.   I'm not going to be able to say there are mental

23        health issues when there's not sufficient

24        information.   There's equivocal information in the

25        record.   Is it likely that she has mental health

26        issues?   Yes.   But what I'm being asked to do is to

27        address the listings and the severity, and this

28        record doesn't allow me to do that reliably or

12

1    consistently.

2    Q.   Okay.  And so, you believe that psychological

3         testing might clear the air?

4    A.   It may, or testing that's been done previously.

5  (AR 113-14.)

6        The ALJ then reexamined Dr. Peterson and attempted to nail

7  down his testimony by asking whether Dr. Goldfein's questionnaire

8  "is essentially at odds with the other medical evidence."  (AR

9  114.)  But Dr. Peterson was again noncommital, replying, "No,

10 your honor, it's consistent with some and at odds with others."

11 (Id.)  He concluded by stating that there was "insufficient

12 information" in the record regarding Plaintiff's mental

13 impairments, and "there are equivocal data," some of which

14 supported Plaintiff's contentions and some of which did not.  (AR

15 118.)  He reiterated that "because of that, we need more

16 information," and "that's the summary of my interpretation of the

17 file."  (Id.)  Plaintiff's attorney then requested further

18 psychological testing, but the ALJ denied the request, stating

19 that it "wouldn't necessarily be further relevant."  (AR 119.)

20       In his written opinion, the ALJ evaluated Dr. Peterson's

21 testimony as follows:

22       At the hearing on November 12, 2009, the medical

23       expert, David Peterson, Ph.D., a licensed psychologist[,]

24       testified that the medical evidence did not show that the

25       claimant had a severe mental impairment.  He said the

26       evidence was insufficient to show a definite mental

27       impairment.  She [sic] had rule [sic] out major

28       depressive disorder vs. dysthymia v. [sic] adjustment

                                13

1   disorder with mixed anxiety and depressive features.  He
2   said that there had been episodes in the past where
3   mental impairments were diagnosed, but the medical
4   evidence showed that she was stable and did not have a
5   medically determinable mental impairment.  Dr. Peterson
6   testified that although the medical record shows some
7   instances of possible significant mental limitations, the
8   overall medical record does not provide sufficient
9   information to support the existence of a severe mental
10   impairment.  In supporting this conclusion, Dr. Peterson
11   noted multiple instances in the record where the claimant
12   denied experiencing any significant mental symptoms [(AR
13   530-73, 656-99)].  Dr. Peterson also pointed out that
14   there is no testing in the record to support Dr.
15   Goldfein's findings of marked limitations in
16   concentration, persistence, or pace.  Finally, Dr.
17   Peterson noted that the most objective evidence of the
18   claimant's mental limitations is the claimant's mental
19   status examinations, which reveal few significant
20   limitations.
21   (AR 34.)
22       The ALJ's characterization of Dr. Peterson's testimony was
23   not correct.  While the ALJ portrayed his testimony as stating
24   unequivocally that the evidence did not show that Plaintiff had a
25   severe impairment, Dr. Peterson actually, and repeatedly,
26   testified that the evidence was "equivocal" and "insufficient" to
27   evaluate Plaintiff's mental functioning and that further testing
28   was likely needed.  (See AR 96-119.)  As in Tonapetyan, the ALJ

14

here "clearly relied heavily on" Dr. Peterson's testimony in

concluding that Plaintiff's impairment was not severe, and

"[g]iven this reliance, the ALJ was not free to ignore" Dr.

Peterson's "equivocations and his concern over the lack of a

complete record upon which to assess" Plaintiff's mental

impairment.  242 F.3d at 1150-51.  Instead, the ALJ had a duty to

supplement the record to resolve the ambiguities identified by

the doctor.  See id.  Because he did not, his decision must be

reversed and the case remanded for further proceedings.  See also

Tate v. Astrue, No. CV 11-3213 CW, 2012 WL 1229886, at *6 (C.D.

Cal. Apr. 12, 2012) (ALJ erred in not further developing record

when "ME suggested that it was difficult for her to form an

opinion with respect to Plaintiff's disability" and ultimate

assessment of Plaintiff's RFC was "highly equivocal"); Rosol v.

Astrue, No. EDCV 08-1692 AGR, 2009 WL 3122779, at *3 (C.D. Cal.

Sept. 25, 2009) ("Having relied on the ME's opinion, the ALJ is

not free to ignore the ME's equivocal testimony that there was

insufficient evidence without treatment records to review.").

B.   Other Issues

Plaintiff also alleges that the ALJ erred in (1) finding

that Plaintiff's mental impairment was not severe; (2) evaluating

and weighing the findings and opinions of Plaintiff's treating

physicians; and (3) determining that Plaintiff's impairments did

not meet or equal any impairments in the Listing.  (J. Stip. at

3-22.)  Because the Court finds that the ALJ's failure to further

supplement the record in light of Dr. Peterson's equivocal and

ambiguous testimony was in error, it is not necessary for it to

address the remainder of Plaintiff's arguments.  See Negrette v.

1  *Astrue*, No. EDCV 08-0737 RNB, 2009 WL 2208088, at *2 (C.D. Cal.

2  July 21, 2009) (finding it unnecessary to address further

3  disputed issues when court found that ALJ failed to properly

4  consider treating doctor's opinion and lay-witness testimony).

5  On remand, the ALJ will necessarily reevaluate the medical

6  evidence regarding the severity of Plaintiff's mental impairments

7  after ordering further testing or obtaining other additional

8  evidence consistent with this opinion.

9  **VI.  CONCLUSION**

10      When error exists in an administrative determination, "the

11  proper course, except in rare circumstances, is to remand to the

12  agency for additional investigation or explanation." INS v.

13  Ventura, 537 U.S. 12, 16, 123 S. Ct. 353, 355, 154 L. Ed. 2d 272

14  (2002) (citations and quotation marks omitted); Moisa v.

15  Barnhart, 367 F.3d 882, 886 (9th Cir. 2004).  Remand for further

16  proceedings is appropriate "if enhancement of the record would be

17  useful."  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004);

18  see Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000)

19  (explaining that "decision of whether to remand for further

20  proceedings turns upon the likely utility of such proceedings").

21  Here, upon remand, the ALJ may order further psychological

22  testing and examinations and hold supplemental administrative

23  proceedings as necessary to resolve the ambiguities in the record

24  identified by Dr. Peterson.  See 20 C.F.R. §§ 404.1519(a),

25  416.919(a); Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001).

26  Accordingly, remand, not an award of benefits, is the proper

27  course in this case.  See Strauss v. Comm'r of Soc. Sec. Admin.,

28  635 F.3d 1135, 1136 (9th Cir. 2011) (remand for automatic payment

of benefits inappropriate unless evidence unequivocally establishes disability).

**ORDER**

Accordingly, **IT IS HEREBY ORDERED** that (1) the decision of the Commissioner is REVERSED; (2) Plaintiff's request for remand is GRANTED; and (3) this action is REMANDED for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

DATED: November 13, 2012

JEAN ROSENBLUTH
U.S. Magistrate Judge

17